UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

JOHN MICALI,

                    Defendant.

MEMORANDUM
AND ORDER DENYING
SUPPRESSION
CR-10-361 (S-2)

## I.    Introduction

Defendant John Micali moves to suppress items recovered from the search of a U-Haul van ("van") driven by him on February 17, 2010. He contends that the warrantless search violated his Fourth Amendment rights because there was no probable cause to search the van.

The search and seizure was proper. There was probable cause to believe that the van was being used in an attempt to take possession of large quantities of marijuana being transported from California to New York in violation of federal and state criminal statutes.

## II.    Facts

On February 16, 2010, a state trooper stopped an individual ("CW") who was speeding on Interstate 80 in Henry County, Illinois. He was driving a pick-up truck pulling an enclosed box trailer ("truck"). During a canine sniff, a drug dog alerted the trooper to the odor of illegal narcotics. A search of the truck revealed approximately 197 pounds of marijuana hidden inside three sofas.

CW agreed to cooperate with state and federal law enforcement officers ("agents") in a controlled delivery attempt in New York. The agents monitored conversations, while they were taking place, through a Kel device, by telephone and in person by CW from the truck's driver's compartment. *See* Transcript Hearing Sept. 27, 2010, p. 19 ("Tr").



While en route to New York, CW received a telephone call from an individual who identified himself as "Brooklyn." "Brooklyn" advised CW to drive to the parking lot of a Target store in Staten Island, New York, where one of his "boys" driving a U-Haul van would meet him. "Brooklyn" told CW that the man in the van would guide CW in his truck to another location a short distance away, presumably to remove the drugs.

On February 17, 2010 at approximately 8:00 p.m., during another recorded call, CW told "Brooklyn" that he had arrived at the parking lot of the Target store in Staten Island. "Brooklyn" asked the CW to pull to the front of the store, but the CW said that it would be better if he stayed where he was due to the size of the trailer. "Brooklyn" then instructed CW that the van would be there shortly.

Approximately eight minutes later, at 8:08 p.m., the van driven by the defendant, John Micali, pulled up next to CW's truck. In a recorded face-to-face conversation, Micali told CW to follow him to a driveway about five minutes away where a shed was located. Micali further explained that he would pull in first and then help the CW back the trailer in.

Relevant portions of the recorded conversations are as follows:

CW (on the way from Illinois to Staten Island, by telephone):

Yeah, I got it. So this is where I'm going?

BROOKLYN: Okay. Yep. Go right there. So listen to me...

CW: Okay.

BROOKLYN: ...Target parking lot my boys will be over there with a U-Haul van waiting for you.

CW: Oh, man! I got a bunch of crap in the back on top of everything.

2

| | |
|---|---|
| BROOKLYN: | Nah, don't worry about it just pull right in over there. You know, you're safe over there. You're good. |
| CW: | Okay. So Target parking lot. This is the address? |
| BROOKLYN: | Yeah. I mean, you, you, you guys ain't gonna stay over there. He's gonna take you to the place, like, a few blocks from there. |

****

Yeah, so, I figure you're only about three hours away. So it's 3:30 now you should get there about, like, 6:30. And one of my boys will shoot over there about, like, six o'clock.

****

| | |
|---|---|
| MICALI, defendant (face-to-face with CW in Target parking lot): | How you doing, my man? |
| CW: | What's really going on? |
| MICALI: | Pretty good. I've been waiting here for you. |
| CW: | [Voices overlap] That is not suggested for this fucking neighborhood in this neck of the woods, man. |
| MICALI: | We got a good driveway… |
| CW: | Okay. |
| MICALI: | All right, cool. |

3

| | |
|---|---|
| CW: | So I'm, I'm following you? |
| MICALI: | Yeah, follow me. It's about five minutes. You're gonna come out, make a right, go around to Arther Kill and make a right and ... |
| CW: | [Voices overlap] I, I know none of these streets, bro'. |
| MICALI: | Yeah, yeah, you just follow, my man. |
| CW: | So just follow you? |
| MICALI: | Yeah. |
| CW: | We're, we're going to a pad or just a warehouse or...? |
| MICALI: | Yeah. No, it got like a driveway with a big shed in the back and everything, yeah. |

****

| | |
|---|---|
| CW: | I have, I have a hard time seeing backing this bitch up so... |
| MICALI: | I'll help you back in. |
| CW: | Can I just pull in? |
| MICALI: | Yeah, no, no. We'll, we'll back it in. This way we'll unload it... |
| CW: | [Voices overlap] You know it flops down. |
| MICALI: | Yeah. |
| CW: | So we got room. |

4

| | |
|---|---|
| MICALI: | Yeah, we got plenty of room. |
| CW: | All right, cool. |
| MICALI: | [U/I]… I'll pull ahead and then, I'll help you back in, okay? |

\*\*\*\*

Transcription of recorded conversation from telephone in cab of CW's truck, Gov. Exh 3500-RS-8, pp. 1-6.

The arresting and searching agents were privy to these conversations before they arrested Micali, looked into the van, observed a laundrylike bag in the back of the van by looking through a window at the back of the cab, and opened and inspected the bag's contents.

CW was observed following Micali along Arthur Kill Road in Staten Island until Micali abruptly made a sharp u-turn and accelerated rapidly in what appeared to be an attempt to leave the area. Tr. P.20. Because the CW was driving a large trailer carrying the marijuana-laden couches, he could not follow Micali and was told by law enforcement to stop.

Agents from the DEA and Illinois State Police followed Micali as he sped down Arthur Kill Road. The agents observed him driving erratically until he made another u-turn and drove onto Korean Veterans War Highway. *Id.* Once on the highway, law enforcement signaled Micali to pull the van over to the side of the road; he did not obey and continued to drive for a few miles until he finally pulled the van over.

After pulling the vehicle over, law enforcement officers placed the defendant in handcuffs. They held him some distance from the van.

Subsequently, another officer peered into the back of the U-Haul through the cab and saw what resembled a laundry bag. *Id.* at 2, 3, 7, 8. Upon opening the back of the van, the agents

picked up the bag and could feel that it contained hard objects. Inside the bag were a number of recently purchased items, including several laundry bags, plastic bags, a pry bar, lanterns and a flashlights. *Id.* at 4.

Since the van did not belong to the defendant Micali, the DEA decided not to sieze it. After securing the van, the agents took it to a nearby commuter parking lot to be picked up b a U-Haul employee. DEA agents subsequently determined that the U-Haul van had been rented by one Hanuka, another suspect in the case.

### III. Law and Conclusion of Law

There was ample ground for the agents at the scene of the arrest to believe that Micali was using the van he was driving in an attempt to take possession of marijuana in the truck being driven by CW. His arrest was valid.

Since he was under arrest and away from the van, Micali's arrest could not be the basis for a search of the van. *See Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009). Tr. At 13 (concession that search of van was not predicated upon possibility that Micali could destroy evidence or take possession of a weapon).

The van was reasonably believed by the agents at the scene to be an instrumentality of a crime, transporting narcotics while crimes were actually being committed. The van was itself evidence of the crime as demonstrated by the 3500 material quoted above. Reasonable agents could reasonably conclude that the van contained further evidence of the crime such as money to pay for the drugs or instruments to offload and take physical possession of narcotic contraband hidden in sofas.

The agents reasonably looked into the U-Haul van, saw a bag that the agents could reasonably infer contained evidence of the crime being committed. They saw a bag obviously

6

placed in the van after it had been rented in an empty condition, probably for the purpose of using it in this illegal venture. The bag was of a type not infrequently observed by the court - - and presumably the agents - - to carry money to purchase drugs, and narcotics of the type seized here, marijuana.

They had the right to search the van and sieze the evidence since they had probable cause "to believe the vehicle contain[ed] contraband or other evidence of a crime." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004); *See also Arizona v. Gant*, 129 S. Ct. at 1719. (Authorizing search if "it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" (citation omitted)).

Based on the evidence submitted the motion to suppress is denied. Should other evidence suggest that this decision is inappropriate, a motion to reconsider may be made.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: September 29, 2010
Brooklyn, New York